287 F.3d 279
 LASALLE NATIONAL BANK, as Trustee under Pooling & Servicing Agreement dated as of May 1, 1998, Mortgage Pass Through Certificates, Series 1998-CI,
v.
FIRST CONNECTICUT HOLDING GROUP, L.L.C. XXIII, A New Jersey Limited Liability Company; James J. Licata; Hamilton Park Health Care
 Center, LTD., A New Jersey Corporation; Public Service Electric & Gas Company; Richard Austin; McClinch Equipment Corp.; James Mitchell Construction Management,
Zeichner Ellman & Krause;* Stephen F. Ellman, Esq.; Philip S. Rosen, in their own right and as attorneys for Plaintiff LaSalle National Bank as Trustee under Pooling & Service Agreement dated as of May 1, 1998 Pass through Certificates, Series 1998-CI, Appellants.
 
 No. 00-2783.
 United States Court of Appeals, Third Circuit.
 Argued November 8, 2001.
 Filed April 24, 2002.
 COPYRIGHT MATERIAL OMITTED William T. Marshall, Jr., Zeichner, Ellman & Krause, John J. Gibbons, Kevin McNulty (Argued), Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Appellants.
 James A. Scarpone (Argued), Hellring Lindeman Goldstein & Siegal LLP, Newark, NJ, for Appellees.
 Before McKEE, RENDELL and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 McKEE, Circuit Judge.
 
 I. Introduction
 
 1
 The law firm of Zeichner Ellman & Krause LLP (the "Zeichner firm"), and two of its attorneys, Philip S. Rosen and Stephen F. Ellman, appeal sanctions the district court imposed under 28 U.S.C. § 1927. The sanctions were largely based upon the court's conclusion that Rosen deliberately misrepresented facts to the court's chambers. The court came to this conclusion by taking "judicial notice" of the contents of two telephone conversations that the court did not personally hear, and was not a party to. For the reasons that follow, we will reverse.
 
 II. Background
 
 2
 This dispute arose out of a mortgage foreclosure action. LaSalle National Bank ("LaSalle") held a recorded first mortgage on several multi-family apartment houses in East Orange, New Jersey that were owned by First Connecticut Holding Company ("First Connecticut"). First Connecticut defaulted on its loan obligations to LaSalle around November of 1999. LaSalle thereafter retained the Zeichner firm to represent LaSalle's interests in the mortgage foreclosure action that LaSalle brought against First Connecticut in the District Court of New Jersey.
 
 
 3
 The LaSalle mortgage was not the only encumbrance on the East Orange properties. James Licata, a principal in First Connecticut, had previously entered into a joint venture with Peter Mocco, and First Connecticut and its holdings were part of that joint venture agreement. Hamilton Park Health Care Center Ltd. ("Hamilton Park") had taken a second recorded mortgage on the East Orange properties to secure advances it made to the Licata/Mocco joint venture. In time, the relationship between Licata and Mocco deteriorated to the point that Mocco sued Licata in New Jersey Superior Court over a dispute related to their joint venture. See Mocco v. Licata, Docket No. ESX-C-397-99 (the "Mocco litigation").[1] The law firm of Hellring Lindeman Goldstein & Siegal, LLP (the "Hellring firm") represented Hamilton Park and Mocco in that litigation, but LaSalle was not a party to the Mocco litigation.
 
 
 4
 Rosen and Ellman filed the aforementioned federal foreclosure action in the United States District Court for the District of New Jersey on behalf of LaSalle based upon that court's diversity jurisdiction. Both Rosen and Ellman were aware that the Mocco litigation involving the status of the East Orange properties was already pending in the New Jersey Superior Court. On February 1, 2000, the New Jersey Superior Court heard oral argument regarding the appointment of a rent receiver for the East Orange properties in the Mocco litigation. Both Rosen and Ellman attended that oral argument. However, that court refused to appoint a receiver, and instead appointed a Special Fiscal agent.
 
 
 5
 Rosen asserts that before he filed LaSalle's Complaint in the district court, he researched the issue of who should receive notice of the foreclosure action. He claims that his research included a treatise that indicated that only those parties that would be adversely affected by the receivership (such as an owner of the property, or parties having a contractual relationship with the lender) were entitled to notice. Rosen performed a title search and found that the sole record owner of the property was First Connecticut. Purportedly in reliance upon his research, Rosen therefore concluded that First Connecticut was the only party entitled to notice of the federal receivership application. Accordingly, before filing the foreclosure action in district court, Rosen contacted First Connecticut's general counsel, Pieter S. de Jong, and informed him that he (Rosen) was about to file a complaint in foreclosure and a motion for appointment of a rent receiver. De Jong told Rosen that First Connecticut would not oppose the rent receivership as long as New Vistas Corporation was recommended as the receiver. Ellman then informed the Hellring firm that the Zeichner firm would be filing the motion.
 
 
 6
 On June 29, 2000, Rosen filed both a Complaint in Foreclosure and a Motion for Appointment of a rent receiver along with an accompanying proposed Order.[2] The Complaint named First Connecticut, James Licata, Hamilton Park, and other relevant parties as defendants. However, the motion for a rent receivership and the accompanying proposed Order named First Connecticut as the sole defendant and provided for service only on First Connecticut. The foreclosure action was assigned to the Hon. Faith S. Hochberg. Thereafter, Rosen prepared an Order to Show Cause why a rent receiver should not be appointed directed at First Connecticut, and forwarded it to the judge's chambers.
 
 
 7
 It is undisputed that Rosen subsequently had two telephone conversations with the judge's law clerk pertaining to the Order to Show Cause. However, the substance of those conversations is very much in dispute. In the first conversation, Rosen claims that he told the law clerk that "borrower's counsel" did not object to a receivership so long as New Vistas was appointed receiver. Rosen claims that his use of the term "borrower's counsel" referred solely to First Connecticut as mortgagor. As we will discuss below, the court concluded that Rosen told the law clerk something quite different.
 
 
 8
 Rosen also submitted a certification from Stephen K. Williams, Vice President of GMAC Commercial Mortgage Corporation ("Williams Certification") in conjunction with his motion for a rent receiver. The Williams Certification was an 18 page document containing a single footnote. That footnote informed the district court of the dispute between Licata and Mocco relating to their joint venture, and further informed the district court of the ongoing litigation in New Jersey Superior Court. The footnote mentioned that LaSalle was not a party to the dispute, and that the state court had appointed a Special Fiscal agent.
 
 
 9
 Rosen then had a second telephone conversation with Judge Hochberg's law clerk the same afternoon as the first one. According to Rosen, the law clerk told him that the court wanted confirmation from "borrower's counsel" that the proposed receivership was unopposed. Rosen relayed that request to de Jong, and de Jong thereafter supplied a letter stating that First Connecticut (as borrower) did not object to a rent receivership so long as New Vistas was appointed receiver. Rosen forwarded that letter to Judge Hochberg's chambers the next day, and on June 30, the court granted the motion and appointed New Vistas as the rent receiver using the proposed Order that Rosen had drafted. The proposed Order provided for notice only to First Connecticut as follows:
 
 
 10
 THIS MATTER having been opened to the Court by Zeichner Ellman & Krause LLP, Attorneys for Plaintiff, upon notice to the defendant-mortgagor, First Connecticut Holding Group, L.L.C. XXIII, upon motion for the appointment of a rent receiver ...
 
 
 11
 A0023 (emphasis added). Paragraph 18 of the proposed Order also stated that "[a] conformed, executed copy of this Order shall be served by plaintiff's counsel upon counsel for defendant-mortgagor, First Connecticut Holding Group, L.L.C. XXIII[.]" A0029. In issuing the proposed Order, the court made certain handwritten changes to the language Rosen had submitted. Most importantly for our purposes, the court added a sentence stating: "defense counsel [] submitted a letter to this Court indicating that it does not object to the entry of this Order[.]" A0024 (emphasis added).
 
 
 12
 After the Order came to the attention of the Hellring firm two attorneys from that firm — Matthew Moloshok and James Scarpone — called Rosen and informed him of their displeasure with the receivership order. On July 5, 2000, Scarpone sent a letter brief to Judge Hochberg's chambers informing the judge that Hamilton Park objected to the appointment of a receiver. The letter also informed the judge that Hamilton Park had not received notice of the receivership petition, and that, contrary to the judge's understanding, Hamilton Park did oppose the receivership. The letter also advised the court of the ongoing litigation in the New Jersey Superior Court and specifically mentioned that the Superior Court had already denied one motion for the appointment of a receiver and was currently considering a second motion for appointment of a receiver. The letter noted that the attorneys from the Zeichner firm had attended the hearing for the appointment of a receiver in Superior Court, and that the Hellring firm was going to file a motion asking the district court to abstain under the Princess Lida[3] doctrine in light of the pending state court litigation. The next day, the Zeichner firm sent a letter to the court in which the firm defended the propriety of its actions in obtaining the receivership in the district court and argued against application of the Princess Lida doctrine.
 
 
 13
 The district court then, sua sponte, scheduled a hearing for July 10 to determine whether the receivership order should be vacated, whether it should refrain from acting under the Princess Lida doctrine, and the extent of the Zeichner firm's knowledge of the state court proceedings. At the hearing, the court expressed understandable concern that Rosen and Ellman had misrepresented that the receivership application was unopposed given the communication the court had subsequently received from agents of Hamilton Park.[4] The following exchange occurred between Rosen and the court:
 
 
 14
 THE COURT: Mr. Rosen, I am mystified, shocked, you name it, that a matter that was presented to this Court as unopposed, when there was no defense counsel that in fact consented to the entry of the order that you sought.
 
 
 15
 MR. ROSEN: Judge, let me address that.
 
 
 16
 THE COURT: No — no. No. Just tell me. Did any defense counsel in this case consent to the entry of your motion for a rent receiver?
 
 
 17
 MR. ROSEN: Yes. I was advised by Mr. DeJong[5] [sic] that he had authority to bind the owner and that he indicated there would be no opposition to the motion.
 
 
 18
 THE COURT: But he's not counsel in this case. Correct? And he told you that.
 
 
 19
 MR. ROSEN: He told me that he's a registered agent, has authority to bind the owner of the property.
 
 
 20
 THE COURT: ... And further did you have consent from any of the other defendants who you sued in this action to your motion for appointment of a rent receiver?
 
 
 21
 MR. ROSEN: No, because I did not think that that was required.
 
 A0183.
 
 22
 Rosen explained that he sought consent only from First Connecticut because he believed, based upon his research, that only the owner of the property (First Connecticut) could object or consent to the appointment of a receiver. The court, however, told Rosen in no uncertain terms that consent must be obtained from all defendants to properly represent to the matter as unopposed:
 
 
 23
 THE COURT: ... let me tell you right now, that if you inform a court that a motion is unopposed, unless you say to that court, defendant X, Y, Z takes the following position, but I don't believe it's relevant, then it's my determination, and not yours, Mr. Rosen, as to who has a right to be heard on a motion. The only reason that the order was entered was based upon your representation that there was no opposition to the motion for appointment of a rent receiver from the defendants in this case. All defendants are entitled to notice of motions, as you well know. And in this case you presented the consent of one person which was misleading, and that he is not even appearing in this action. And the other defendants did not give you consent, and yet you represented that the motion was unopposed. This is misleading to the Court, Mr. Rosen. The motion is vacated. The appointment of the rent receiver is hereby vacated based upon your misrepresentations to this Court.
 
 
 24
 MR. ROSEN: Judge, I would just say that there was absolutely no intent whatsoever to deceive or mislead this Court. In my experience with rent receivers, I've never had a situation where notice had to be given to anyone other than the owner of the property. The documents I have in my file, which I've submitted to this Court, evidence that there's only one owner of the property.
 
 
 25
 A0184-85. The next day the district court entered an order vacating the receivership, and taxing all costs resulting from the receivership as of that date against the Zeichner firm.
 
 
 26
 The court also sua sponte issued an Order to Show Cause why sanctions should not be imposed under 28 U.S.C. § 1927 for unreasonably multiplying the litigation, and a show cause hearing was held on July 14, 2000. William Marshall, another partner at the Zeichner firm, represented Rosen and Ellman at the show cause hearing. During that hearing the court quickly made it very clear that it believed that Rosen had misrepresented the circumstances surrounding the receivership petition during discussions with the judge's law clerk. Rosen took the stand and testified about those discussions as follows:
 
 
 27
 Q: ... Did you have any conversation with anyone from the Judge's chambers?
 
 
 28
 A: I did. I explained to [the law clerk] again that I had a conversation, I do not believe I ever referenced Mr. DeJong's [sic] name. The way I stated it was I had a conversation with borrower's counsel. I explained to her that initially we were seeking Sutton and Edwards as a rent receiver. But that First Connecticut didn't feel that they were an appropriate receiver, but that New Vistas Corporation would be more appropriate. That we confirmed with our client that it would be appropriate to utilize New Vistas, and that based upon that they had told me, "they" being the borrower's counsel, that they would not be objecting to the entry of the receivership application. [The law clerk] suggested that she would advise the court of that, and I left.
 
 
 29
 Q: Okay. And did there come a time when you had subsequent contact with [the law clerk]?
 
 
 30
 A: Yes. That afternoon being the afternoon of June 29th, I received a call from [the law clerk], who suggested that the Court would like, either by way of a letter or some other communication from borrower's counsel, that in fact the statement that I had made to the Court was true, that they were not objecting, and to secure that, and then FAX it over, and she indicated that the Court doesn't really accept FAXes, but for this purpose I could get the letter and FAX it over. I hung up from [the law clerk] and called Mr. DeJong[sic] to explain the instructions that I had. Mr. DeJong[sic] was not available. I left a voice mail message and the morning of June 30th, which was the next morning, that being a Friday, I'll send you the letter in about two hours. I got the letter, stuck it in the FAX machine and sent it to [the law clerk].
 
 
 31
 Q: Okay.
 
 
 32
 Did you ever make the representation to the Court either directly to the Court or through the court clerk, the law clerk, that you had the consent of all parties to the action to the receivership? A: No, I — no, I'm sorry, Mr. Marshall, no, I did not.
 
 
 33
 Q: Okay.
 
 
 34
 Did you ever intend to deceive the Court in connection with your application?
 
 
 35
 A: I never intended to deceive the Court.
 
 
 36
 A0270-72.
 
 
 37
 Rosen specifically denied ever using the term "defense counsel" in speaking to the judge's law clerk.
 
 
 38
 Q: Did you ever use the term "defense counsel" in dealing with the Court's chambers?
 
 
 39
 A: No, sir, I didn't.
 
 A0274.
 
 40
 The law clerk was never called to the stand to testify. The law clerk's version of events, therefore, was never placed on the record, and Rosen's counsel was not able to cross examine her regarding any inconsistencies with Rosen's account, or explore whether differing recollections merely resulted from an innocent misunderstanding. Consequently, the only sworn testimony regarding the communications between the law clerk and Rosen came from Rosen. Nevertheless, the court rejected Rosen's testimony outright. The court did so by taking "judicial notice" that Rosen had used the term "defense counsel" rather than "borrower's counsel" in his communications with the law clerk. The following exchange reflects the court's reasoning:
 
 
 41
 THE COURT: I can tell ... that the reason that the words "defense counsel" appear in handwriting is because that's what was requested, that Mr. Rosen provide a letter stating that defense counsel does not object. That is, as you know from years of litigation, the very standard way in which one demonstrates non-opposition.
 
 
 42
 MR. MARSHALL: Well, Your Honor, not to be argumentative, but it is — it is contrary to the first page of the order.
 
 
 43
 THE COURT: No, the first page talks about notice. I'm talking about the representation to chambers. Mr. Rosen was told-Mr. Rosen, as you conceded earlier in our colloquy, represented to chambers that the matter was unopposed, and you earlier said yes, that's right.
 
 
 44
 MR. MARSHALL: Well —
 
 
 45
 THE COURT: And then he was told, because I was told about this, to get a written statement, either certification or letter from defense counsel, so stating. And that's why the words "defense counsel" appear in the order. Because in response to that, that's when the letter came in. There was never distinction [sic] made by "borrower's counsel" and "defense counsel."
 
 
 46
 MR. MARSHALL: I believe that Mr. Rosen' testimony was he talking [sic] in terms of borrower's.
 
 
 47
 THE COURT: That's what he now says. But the words that were used by chambers were to provide a letter from "defense counsel" and without that being corrected the letter comes in and it is only natural for the Court to assume that he's complied with the request to provide a letter from defense counsel, which is why the words "defense counsel" appear in that, a handwritten notation editing the form of the order.
 
 
 48
 MR. MARSHALL: But those are not his words, Your Honor. Those are the words at the time the order was issued, not at the time that he prepared this order and —
 
 
 49
 THE COURT: No, those were the words that reflect the Court's direction to him, that he is to produce a writing from defense counsel.
 
 
 50
 MR. MARSHALL: Your Honor, I believe this was prepared after the Court received the letter, because it says the Court, I'm sorry, and defense counsel having submitted a letter to the court.
 
 
 51
 THE COURT: Exactly.
 
 
 52
 MR. MARSHALL: A letter, which letter on its own face says that he's only general counsel to First Connecticut.
 
 
 53
 THE COURT: Mr. Marshall, I know you're trying the best you can, but that letter doesn't say "I'm not defense counsel." It doesn't say "I'm not making an appearance in this action." And that letter was produced, I am telling you as a matter of fact, of which I take judicial notice, that letter was produced by Mr. Rosen in response to an oral request from my chambers to produce either a certification or a letter from defense counsel stating that there was no opposition.
 
 
 54
 A0299-0302 (emphasis added).
 
 
 55
 On August 22, the court entered an Order and accompanying published Opinion sanctioning Rosen and Ellman under 28 U.S.C. § 1927. Rosen and Ellman were ordered to personally pay attorneys' fees to the Hellring firm for time it spent working on the receivership issue in the amount of $3,378. Rosen and Ellman were also ordered to personally bear the costs of the rent receiver in the amount of $10,874.25. This appeal followed.
 
 III. DISCUSSION
 
 56
 We review the district court's imposition of attorney sanctions under 28 U.S.C. § 1927 for an abuse of discretion. See In re Orthopedic Bone Screw Products, 193 F.3d 781, 795 (3d Cir.1999); Zuk v. East. Pennsylvania Psych. Inst., 103 F.3d 294, 297 (3d Cir.1996). An abuse of discretion occurs when the court bases its opinion on a clearly erroneous finding of fact, an erroneous legal conclusion, or an improper application of law to fact. See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 278 F.3d 175, 180 (3d Cir.2002). Moreover, inasmuch as a district court's finding of bad faith on the part of an attorney is a finding of fact, we review it for clear error. See Hackman v. Valley Fair, 932 F.2d 239, 242 (3d Cir. 1991).
 
 A. 28 U.S.C. § 1927
 28 U.S.C. § 1927 provides:
 
 57
 Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.
 
 
 58
 28 U.S.C. § 1927 (1999). The statute thus limits attorney sanctions imposed thereunder to those situations where an attorney has: (1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct. See In re Prudential Ins., 278 F.3d at 188. The sanctions that may be imposed under § 1927 are also limited to excess costs and expenses that are incurred "because of such conduct." 28 U.S.C. § 1927.
 
 
 59
 The sanctions are intended to deter an attorney from intentionally and unnecessarily delaying judicial proceedings, and they are limited to the costs that result from such delay. See Zuk, 103 F.3d at 297. Although § 1927 provides a court with a mechanism for sanctioning vexatious and willful conduct, "courts should exercise [this sanctioning power] only in instances of a serious and studied disregard for the orderly process of justice." Ford v. Temple Hosp., 790 F.2d 342, 347 (3d Cir.1986), quoting Overnite Transp. Co. v. Chicago Industr. Tire Co., 697 F.2d 789, 795 (7th Cir.1983).
 
 
 60
 The power to sanction under § 1927 necessarily "carries with it the potential for abuse, and therefore the statute should be construed narrowly and with great caution so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." Mone v. Commn'r of Intern. Revenue, 774 F.2d 570, 574 (2d Cir.1985); see also Ford, 790 F.2d at 349 ("The uncritical imposition of attorneys' fees can have an undesirable chilling effect on an attorney's legitimate ethical obligation to represent his client zealously."); Baker Industr. Inc. v. Cerberus, Ltd., 764 F.2d 204, 208 (3d Cir.1985) ("Th[e] bad faith requirement is ... necessary to avoid chilling an attorney's legitimate ethical obligation to represent his client zealously[.]").
 
 
 61
 Consequently, sanctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal. See Zuk, 103 F.3d at 297; Ford, 790 F.2d at 347; Baker Industr., 764 F.2d at 208. In Baker Industr., we approvingly noted the bad faith standard adopted in Colucci v. New York Times Co., 533 F.Supp. 1011 (S.D.N.Y.1982). The Colucci court stated that under § 1927, an attorney's "conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." Baker Industr., 764 F.2d at 208, quoting Colucci, 533 F.Supp. at 1014. Thus, we have stated that the bad faith requirement is necessary for a finding of liability, otherwise "an attorney who might be guilty of no more than a mistake in professional judgment in pursuing a client's goals might be made liable for excess attorneys' fees...." Baker Industr., 764 F.2d at 209.[6]
 
 B. Rosen and Ellman's Conduct
 
 62
 The sanctions imposed on Rosen and Ellman were based upon the following findings: (1) Rosen and Ellman failed to provide notice to all defendants that LaSalle was seeking a receivership; (2) the judge's law clerk told Rosen to supply a letter to chambers from "defense counsel" that the motion was unopposed; (3) the de Jong letter that Rosen provided only reflected the position of one "defendant"; and (4) with the exception of the aforementioned footnote in the Williams Certification, Rosen's papers did not disclose the simultaneous state court litigation. However, it seems clear to us that the district court's requisite finding of bad faith rests primarily, if not entirely, upon the court's conclusion that Rosen intentionally misrepresented that the receivership was unopposed in his discussions with the court's law clerk. Moreover, to the extent that the court's finding of bad faith does not rest solely on that factor, it certainly appears to have been colored by it. That conclusion, in turn, results from the "judicial notice" that the court took of what Rosen told the law clerk during his telephone discussions with her. Rosen insists that his discussions with the law clerk referred only to "borrower's counsel," but the court took "judicial notice" and found as a matter of fact that he had deliberately and falsely stated that "defense counsel" did not object.
 
 
 63
 Federal Rule of Evidence 201(b) defines a judicially noticed fact as one that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). For all practical purposes, judicially noticing a fact is tantamount to directing a verdict against a party as to the noticed fact. See Werner v. Werner, 267 F.3d 288, 295 (3d Cir.2001), citing United States v. Jones, 29 F.3d 1549, 1553 (11th Cir.1994).
 
 
 64
 Here, there was clearly a disputed issue of fact as to whether Rosen referred to "borrower's counsel" or "defense counsel" in speaking to the judge's law clerk, and whether the clerk had requested a letter from "borrower's counsel" as opposed to "defense counsel." As noted above, Rosen took the witness stand at the show cause hearing and testified under oath that he used the term "borrower's counsel" when speaking to the court's chambers. The record from that hearing shows that, without any contrary testimony whatsoever, the district court rejected Rosen's account and thereafter based a conclusion of bad faith under § 1927 upon a finding that Rosen's explanation was not credible. As noted above, the court explained its rejection of Rosen's account as follows: "I am telling you as a matter of fact, of which I take judicial notice, that [the de Jong letter] was produced by Mr. Rosen in response to an oral request from my chambers to produce either a certification or a letter from defense counsel stating that there was no opposition." A0300-0302 (emphasis added).
 
 
 65
 The court's finding of fact of the content of the disputed conversations between Rosen and the law clerk understandably colored the court's view of Rosen's conduct here. The court took judicial notice of those two conversations even though the court did not hear any part of the disputed conversations and had no way of knowing what was said other than asking the law clerk; the only participant other than Rosen. We must, therefore, conclude that the judge's certainty as to the substance of Rosen's communications with her chambers was based on private discussions she had with her law clerk — discussions that neither Rosen nor his attorney were privy to or informed of.
 
 
 66
 There is absolutely no way that the contents of Rosen's disputed conversations with the judge's law clerk even remotely satisfies the requirements for judicial notice in Rule 201(b). The contents of those conversations are certainly not a matter of common knowledge, nor are they easily provable from a source whose accuracy cannot reasonably be questioned. See e.g. Oran v. Stafford, 226 F.3d 275, 289 (3d Cir.2000) (taking judicial notice of the contents of properly authenticated public disclosure documents filed with the SEC); Policemen's Benevolent Ass'n v. Washington Township., 850 F.2d 133, 137 (3d Cir. 1988) (taking judicial notice of Township's police force regulations); Gov't of the Virgin Islands v. Testamark, 528 F.2d 742, 743 (3d Cir.1976) (upholding judicial notice of defendant's prior conviction).
 
 
 67
 We certainly understand that a judge would be most reluctant to allow his/her law clerk to be called to the witness stand and questioned under oath under the circumstances here. Moreover, we are not unsympathetic to the dilemma this created for the judge. However, that dilemma does not justify short circuiting the fact finding process by a mantra-like reliance on "judicial notice." This is especially true in light of the severe consequences that flowed from the court's resolution of the factual dispute about the conversations with the law clerk. The court's conclusion regarding those conversations was a key factor in finding bad faith. Yet, Rosen was not able to confront the only witness who could possibly corroborate or dispute his version of the conversations.[7] Thus, not only was the court's resort to "judicial notice" improper, it also denied Rosen "a meaningful opportunity to be heard." Fellheimer v. Charter Tech., 57 F.3d 1215, 1227 (3d Cir.1995).
 
 We have previously stated that:
 
 68
 Sanctions are not to be assessed without full and fair consideration by the court. They often entail a fine which may have more than a token effect upon an attorney's resources. More importantly, they act as a symbolic statement about the quality and integrity of an attorney's work — a statement which may have[a] tangible effect upon the attorney's career.
 
 
 69
 Id. (emphasis added). The sanctions here were not based upon "full and fair consideration." Given the importance of the factual finding arising from that hearing, and the sanctions that followed, we hold that the court's resort to "judicial notice" to resolve what was said in the conversations between the sanctioned attorney and the court's law clerk simply can not withstand scrutiny.
 
 
 70
 We are aware, or course, that the court's finding of bad faith could also have been influenced by the circumstantial evidence relating to the language the court added to the receivership order, as well as the court's concern with the "veiled" reference to the state court proceedings that Rosen had arguably "buried" in the single footnote of the Williams Certification. However, we doubt that that evidence alone would have caused the court to so readily conclude that Rosen was acting in bad faith absent the court's belief that Rosen had made misrepresentations to its law clerk. Moreover, the fact that Ellman orally notified the Hellring firm of the receivership before Rosen filed the papers, and the fact that Rosen made copies of the papers available to the Hellring firm after the receivership Order was entered could very well have precluded a finding of bad faith absent the court's belief about the substance of Rosen's conversations with the law clerk. Similarly, we believe that the court's reaction to Rosen's disclosure of the state court litigation in a footnote in the Williams Certification may have been affected, at least in part, by the court's view of Rosen's credibility.[8] Inasmuch as the court's conclusion regarding bad faith under § 1927 can not be divorced from the judicial notice of the two conversations, we conclude that the sanctions that were imposed were an abuse of discretion.
 
 
 71
 The July 11 Order sanctioning the Zeichner firm was equally an abuse of discretion. A law firm can only speak and act through its agents. See In re Am. Biomaterials Corp., 954 F.2d 919, 923 (3d Cir.1992) (noting that a corporation can act only through its agents and employees). Here, the Zeichner firm acted through Rosen and Ellman. The July 11 Order relied upon the same findings of fact as the August 22 Order. Inasmuch as the court's improper reliance upon "judicial notice" was the underpinning for both Orders, neither can stand.
 
 
 72
 We are aware that this disposition allows for the possibility of further hearings to determine what Rosen said to Judge Hochberg's law clerk. We have already commented upon the awkwardness of any judge being placed in a position of making credibility determinations regarding his/her law clerk's testimony in an adversarial setting. Moreover, if § 1927 sanctions are to be pursued, "opposing counsel" would be placed in the untenable position that we noted above of having to cross examine the judge's law clerk and possibly attack her credibility. This extremely difficult scenario is exacerbated because the judge has already made a finding of fact as to the contents of the disputed conversations between Rosen and her law clerk. Having already made that finding, it will be difficult for Judge Hochberg to maintain the appearance of objectivity if she reimposes sanctions on remand. This holds true even if she objectively concludes that sanctions are warranted without considering Rosen's communications with her chambers.
 
 
 73
 "[P]ublic confidence in the judicial system mandates, at a minimum, the appearance of neutrality and impartiality in the administration of justice." Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 157 (3d Cir.1993); see also In re School Asbestos Litigation, 977 F.2d 764, 776 (3d Cir.1992). "When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced." Primerica Holdings, 10 F.3d at 166.
 
 
 74
 "[J]ustice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954). Thus, in Haines v. Liggett Group, 975 F.2d 81 (3d Cir.1992), we stated that the polestar of a judge's decision is "[i]mpartiality and the appearance of impartiality," inasmuch as they are the sine qua non of the American legal system. Haines, 975 F.2d at 98. Therefore, despite the reservations we always have when reassigning a case from an excellent and dedicated jurist, we nevertheless have a responsibility to exercise our supervisory authority and will do so in an appropriate case. We conclude that such reassignment is appropriate here under either the All Writs Act, 28 U.S.C. § 1651(a), or 28 U.S.C. § 2106. See Primerica Holdings, 10 F.3d at 167, citing United States v. Torkington, 874 F.2d 1441, 1446 (11th Cir.1989).
 
 
 75
 Accordingly, we will direct the Chief Judge of the United States District Court for the District of New Jersey to order the Clerk of that court to reassign this case to another judge in that district for any further proceedings in this case.
 
 
 76
 Before closing we pause to note that, in reversing these Orders, we do not in any way intend to minimize the importance of an attorney's candor with the court, or the court's staff. Nor do we intend to limit a court's ability to respond appropriately when an attorney's bad faith burdens judicial proceedings. As an officer of the court, an attorney must comport himself/herself with integrity and honesty when making representations regarding a matter in litigation. "An attorney's obligation to the court is one that is unique and must be discharged with candor and with great care. The court and all parties before the court rely upon representations made by counsel. We believe without qualification that an attorney's word is his bond." Baker Industr., 764 F.2d at 212. However, the record before us does not support the district court's conclusion that Rosen, Ellman, or the Zeichner firm breached that duty here and we therefore conclude that the court abused its discretion in imposing sanctions under § 1927.
 
 IV. Conclusion
 
 77
 For the reasons set forth above, the district court's August 22, 2000 Order is vacated in full, and the July 11, 2000 Order is vacated in part, insofar as it imposes sanctions.[9]
 
 
 
 Notes:
 
 
 *
 Pursuant to Rule 12(a), F.R.A.P
 
 
 [1]
 TheMocco litigation was pending in the New Jersey Superior Court as one of five cases consolidated under Titan Management L.P., et al. v. Licata, Docket No. ESX-C-280-98, at the time this appeal was argued.
 
 
 [2]
 Rosen initially filed the Complaint on June 26, 2000, but that Complaint was immediately dismissed because diversity of citizenship was not established on the face of the complaint
 
 
 [3]
 Princess Lida v. Thompson, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939) holds that where two cases are filed in separate courts and involve in rem or quasi in rem jurisdiction over the same property, the court in which the suit was first filed obtains jurisdiction to the exclusion of all other courts.
 
 
 [4]
 De Jong was also questioned by the court during the hearing. He told the court that he was not authorized to represent First Connecticut in the litigation, and that by sending the letter to Rosen, he did not intend to enter an appearance. The district court expressed extreme displeasure with de Jong's having sent a letter to Rosen, since de Jong did not clarify in the letter that he was not entering an appearance on behalf of First Connecticut, and de Jong knew that Rosen would be forwarding the letter to the court. A0177-0182
 
 
 [5]
 The hearing transcript misspells counsel's name as "DeJong." However, counsel's name is properly spelled "de Jong."
 
 
 [6]
 The Supreme Court has also cautioned that courts must employ restraint in deciding to impose sanctions, as over eagerness could have the effect of "discourag[ing] all but the most airtight claims[.]"See Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (discussing attorneys' fees under Title VII).
 
 
 [7]
 Of course, Marshall could have called the law clerk to the stand on behalf of Rosen at the Show Cause hearing. However, we also recognize that an attorney would be reluctant (to say the least) to call a law clerk to the witness stand to testify before the very judge the clerk was clerking for under circumstances that might require a fairly aggressive cross examination in front of the "clerk's judge." Under these circumstances, it is hardly appropriate, practical, or fair to require the "opposing" party to call a judge's law clerk to the witness stand
 
 
 [8]
 We realize the court expressed a reluctance to parse the footnote's finer points given the court's belief that "defense counsel" did not object to the requested relief. Given the crowded dockets that district courts must manage, we certainly understand that the court's belief that the matter was unopposed may have resulted in a more cursory examination of the Williams Certification than the court would otherwise have given it. However, the fact that discussion of the state court litigation was limited to a footnote in that Certification does not necessarily mean that Rosen was intentionally hiding that information. The Certification was not lengthy, and the footnote at issue was the only one in the entire document. That footnote stated in pertinent part:
 Plaintiff has also learned that Messrs. Licata and Mocco are having serious disputes concerning their so-called joint venture and are parties to Titan Management, L.P. v. Licata, et al., ... Plaintiff is not a party to [this] matter but has learned that the court has appointed a fiscal agent....
 App. 11. Absent the court's negative view of Rosen's candor, the judge may not have viewed this footnote with such a jaundiced eye.
 
 
 [9]
 Inasmuch as we are reversing based upon the district court's use of judicial notice to resolve a factual dispute, we need not further address appellants' argument that the district court's procedures denied them due process. Moreover, since the only issue before us is the propriety of the sanctions under § 1927, our discussion has no impact on the portion of the district court's July 11 Order vacating the receivership